Juanita **ELBERT**, as proposed administratrix for the estate of Anthony P. Elbert, decedent, Plaintiff,

v.

**NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, Defendant.**

**Case No. 08–CV–10998 (KMK).**

United States District Court, S.D. New York.

Sept. 30, 2010.

---

Gail B. Rice, Esq., Rice & Rice Attorneys At Law, New Rochelle, NY, for Plaintiff.

Christopher L. Van De Water, Esq., Attorney General of the State of New York, New York, NY, for Defendant.

### OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Plaintiff Juanita Elbert ("Plaintiff") brings this action against the New York State Department of Correctional Services ("Defendant"), as proposed administratrix for the estate of her son, Anthony P. Elbert ("Decedent"). Plaintiff sues under 42 U.S.C. § 1983 ("§ 1983"), asserting violations of the Eighth and Fourteenth Amendments, as well as Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Defendant has moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons stated herein, the Court grants Defendant's Rule 12(b)(6) motion.

### I. Background

#### A. Factual Background

The Court assumes the following facts to be true, as alleged in the Amended Complaint, for the purposes of this motion to dismiss. Decedent had been incarcerated in several New York correctional facilities. (Am. Compl. ¶¶ 8–9, 11, 17.) On March 20, March 25, and April 1, of 2002, Decedent "made sick calls to the medical department

at Downstate Correctional Facility" in Fishkill, New York, because of pain in his joints, hands, and legs. (*Id.* ¶ 8.) On May 2, 2002, after being transferred to the Sing Sing Correctional Facility in Ossining, New York, Decedent placed another sick call, requesting an examination by a doctor and blood work. (*Id.* ¶ 9.) In response, Decedent received ibuprofen. (*Id.*) On July 1, 2002, Decedent again requested a doctor visit and blood work due to continued joint pain, but was ignored. (*Id.* ¶ 10.) In August 2002, while in the Clinton Annex Correctional Facility ("Clinton Annex"), Decedent "repeated[ly] complain[ed] of joint pains" and "abnormal swelling of his joints." (*Id.* ¶ 11.) On September 4, 2002, a prison nurse performed blood work on Decedent and irregularities were detected. (*Id.* ¶ 12.) On September 9, 2002, Dr. Robert Snider reviewed Decedent's blood work and referred Decedent to a rheumatologist. (*Id.* ¶ 13.) A prison review committee denied the referral, however, because the request did not include the lab reports or the doctor's office notes. (*Id.*) The committee advised Clinton Annex to resubmit the transfer request with the proper paperwork. (*Id.*) On October 2, 2002, Decedent complained of "muscle spasms in his [ ] back" and requested to see a doctor. (*Id.* ¶ 14.) That request was denied. (*Id.*) On October 3, 2002, Decedent sought medical attention because he fell on the floor. (*Id.* ¶ 15.) Decedent was offered Tylenol in response. (*Id.*) On Oc-

tober 4, 2002, Decedent "complained of wobbly legs, blurred vision[,] and other serious medical complications" and sought medical attention. (*Id.* ¶ 16.) On the same day, Decedent "went into a coma and was transferred to Albany Medical Center." (*Id.*) When Decedent awoke from the coma, he was paralyzed from the waist down. (*Id.*) Shortly thereafter, he was diagnosed with transverse myelitis. (*Id.*)[1] Over three and one-half years later, on June 19, 2006, Decedent was released from prison. (*Id.* ¶ 17.) On April 6, 2008, almost two years after release, Decedent died as a result of the medical complications discussed above. (*Id.* ¶ 18.)

### B. Procedural Background

Plaintiff filed a Complaint against the New York State Department of Correctional Services on December 18, 2008. (Dkt. No. 1.) Plaintiff amended the Complaint on July 16, 2009. (Dkt. No. 4.) Defendant moved to dismiss on December 10, 2009. (Dkt. No. 8.) The Court held oral argument on July 16, 2010. (Dkt. No. 13.)

Before his death, Decedent filed similar lawsuits in the New York Court of Claims, and the United States Court of Claims. (Am. Compl. ¶¶ 6–7.)

## II. Discussion

### A. Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plain-

---

1. According to the National Institute of Health, transverse myelitis is:

   [A] neurological disorder caused by inflammation across both sides of one level, or segment, of the spinal cord.... Attacks of inflammation can damage or destroy myelin, the fatty insulating substance that covers nerve cell fibers. This damage causes nervous system scars that interrupt communications between the nerves in the spinal cord and the rest of the body.
   Symptoms of transverse myelitis include a loss of spinal cord function over several

   hours to several weeks. What usually begins as a sudden onset of lower back pain, muscle weakness, or abnormal sensations in the toes and feet can rapidly progress to more severe symptoms, including paralysis, urinary retention, and loss of bowel control. Nat'l Inst. of Neurological Disorders and Stroke, Nat'l Inst. of Health, Transverse Myelitis Fact Sheet, http://www.ninds.nih.gov/disorders/transversemyelitis/detail_transverse myelitis.htm (last visited Sept. 29, 2010).

tiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero*, 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir.2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level," *id.*, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955.

Simply put, Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.; see also Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (internal citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).[2]

In adjudicating a Rule 12(b)(6) motion, a court may consider "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference," or facts of which the Court may take judicial notice. *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir.2005); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999). The Court also may consider documents that are referenced in, and integral to, the complaint. *See Blakeman v. The Walt Disney Co.*, 613 F.Supp.2d 288, 297 (E.D.N.Y.2009). In considering a Rule 12(b)(1) motion, a court may rely on evidence extrinsic to the pleadings. *See Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir.2002); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986).

### B. Analysis

#### 1. § 1983 Claims

Plaintiff asserts causes of action under 42 U.S.C. § 1983, alleging that Defendant violated Decedent's Eighth and Fourteenth Amendment rights. The Eleventh Amendment bars suits by individuals against a state in federal court without that state's consent. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267–68, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). This principle of sovereign immunity extends to state agencies. *See McGinty v. New York*, 251 F.3d 84, 95 (2d Cir.2001); *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir.1996); *Owens v. Coughlin*, 561 F.Supp. 426, 428 (S.D.N.Y. 1983). New York has not consented to being sued in federal court. *See Trotman v. Palisades Interstate Park Comm'n*, 557

---

**2.** The same pleading requirements apply to motions to dismiss brought pursuant to Rule

12(b)(1). *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir.2003).

F.2d 35, 38–40 (2d Cir.1977) (noting that New York state has consented only to being sued in the New York Court of Claims); *Lyerly v. Phillips*, No. 04–CV–3904, 2005 WL 1802972, at \*3 (S.D.N.Y. July 29, 2005) (noting that the New York Department of Corrections is immune from federal lawsuits); *Bryant v. N.Y. State Dep't of Corr. Servs. Albany*, 146 F.Supp.2d 422, 425 (S.D.N.Y.2001) (noting that it is "beyond dispute" that New York and its agencies have not consented to being sued in federal court (internal quotation marks omitted)).[3]

■ Further, while, in some instances, Congress may abdicate a state's sovereign immunity, *see, e.g., United States v. Georgia*, 546 U.S. 151, 158–59, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), Congress did not do so in § 1983, *see Haywood v. Drown*, —— U.S. ——, 129 S.Ct. 2108, 2113 n. 4, 173 L.Ed.2d 920 (2009) ("[A] plaintiff seeking damages against [a] State ... cannot use § 1983 as a vehicle for redress because a State is not a 'person' under § 1983."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity...."); *Fitzpatrick*, 427 U.S. at 452, 96 S.Ct. 2666 ("[Section 1983] could not have been intended to include States as parties defendant."); *Davis v. New York*, 316 F.3d 93,

101 (2d Cir.2002) (affirming dismissal of § 1983 action for damages against state employees in their official capacities on sovereign immunity grounds); *Mateo v. Fischer*, 682 F.Supp.2d 423, 429 (S.D.N.Y. 2010) (noting that the Eleventh Amendment bars federal lawsuits seeking damages under § 1983 against state entities). Accordingly, Plaintiff's § 1983 claims are barred by sovereign immunity and must be dismissed.

### 2. ADA Claims

■ Plaintiff also asserts claims under Title II of the ADA, which mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Supreme Court has held that this provision applies to state prisoners. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates."). In order to state a violation of Title II, a plaintiff must allege that: 1) he or she is a qualified individual with a disability; and 2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reasons of his or her disability. *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir.2004); *Atkins v. County of Orange*, 251

---

**3.** A plaintiff aggrieved by the actions of a New York correctional officer may sue the state in the Court of Claims, *see* N.Y. Correct. Law § 24(2) ("Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the [N.Y.] [D]epartment [of Corrections] shall be brought and maintained in the court of claims as a claim against the state."), as Plaintiff has done here, (Am. Compl. ¶ 6). A plaintiff may also sue an indi-

vidual correctional officer who violates his or her constitutional rights under § 1983, in federal or state court. *See Haywood v. Drown*, —— U.S. ——, 129 S.Ct. 2108, 2117–18, 173 L.Ed.2d 920 (2009) (invalidating New York law which barred suits seeking money damages against correctional officers, and noting "Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages" (emphasis in original)).

F.Supp.2d 1225, 1231 (S.D.N.Y.2003). The second prong requires the disabled plaintiff to allege that his or her mistreatment "was motivated by either discriminatory animus or ill will due to disability." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 112 (2d Cir.2001). This animus requirement reflects the purpose of Title II, which is "to eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998).

Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability. *See, e.g., id.* (dismissing ADA claim where it was "clear that the plaintiff [wa]s in essence challenging the adequacy of his [Vocational Educational Services for Individuals with Disabilities] services, not illegal disability discrimination"); *Nails v. Laplante,* 596 F.Supp.2d 475, 481–82 (D.Conn.2009) (dismissing inmate's ADA claim, which focused on inadequate medical care, because the complaint "d[id] not include any nonconclusory allegations of discriminatory animus or ill will based on his disability and identifie[d] no program he could not participate in or any service that was denied as a result of his disability"); *Carrion v. Wilkinson,* 309 F.Supp.2d 1007, 1016 (N.D.Ohio 2004) ("[Plaintiff] failed to allege that the defendants denied him the benefits of any services, programs, or activities provided for other non-disabled inmates, or that [the defendants] subjected him to discrimination because of his diabetes. Instead, he claims that he was denied a diabetic diet ... [but this] is not the type of claim that the ADA ... [was] intended to cover." (internal quotation marks and brackets omitted)); *Atkins,* 251 F.Supp.2d at 1232 (dismissing mentally-disabled inmates' ADA claim, which alleged that they were placed in isolation, because they did not "allege that violent and self-destructive inmates who are disabled due to mental illness are treated any differently than violent, self-destructive inmates who are not disabled due to mental illness"); *id.* (dismissing disabled plaintiff's ADA claim that alleged that he received an "inappropriate medical regime [that] caused him to sleep all the time, miss recreation and meal opportunities and otherwise deprive[d] him of any significant activity of any kind while he was at the jail," because the claim was "in essence challenging the adequacy of the mental health services provided at the Jail, not illegal disability discrimination" (internal quotation marks omitted)); *Galvin v. Cook,* No. 00–CV–29, 2000 WL 1520231, at *6–7 (D.Or. Oct. 3, 2000) (dismissing ADA claim of a diabetic inmate who alleged improper treatment of his diabetes, but "failed to allege that the State defendants denied him the benefits of any services, programs, or activities provided for other non-disabled inmates, or that they subjected him to discrimination because of his diabetes," because the ADA "afford[s] disabled persons legal rights regarding access to programs and activities enjoyed by all, but do[es] not provide them with a general federal cause of action for challenging the medical treatment of their underlying disabilities"); *Moore v. Prison Health Servs., Inc.,* 24 F.Supp.2d 1164, 1168 (D.Kan.1998) ("[T]he plaintiff ... stated no more than a claim which challenges the medical care provided for his medical condition. He has not stated a claim for relief under the ADA because he does not complain he has been denied the benefit of the services, programs, or activities ... due to discrimination based upon his disability." (internal quotation marks omitted)), *aff'd,* 201 F.3d 448 (10th Cir.1999). By contrast, a court might not dismiss a suit by a disabled prisoner if it alleges that he or she has been denied services that have been provided to other

prisoners. *See, e.g., McNally v. Prison Health Servs.,* 46 F.Supp.2d 49, 58–59 (D.Me.1999) (concluding that an HIV patient's claim of discriminatory denial of prescription services provided to general prison population would state an ADA claim); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037–38 (S.D.N.Y.1995) (granting relief under ADA where hearing-impaired inmates alleged their rights were violated by the prison's practice of conducting disciplinary, grievance, and parole hearings without providing interpretive services or assistive devices). As Judge Posner has explained:

> [The ADA is] not ... violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; [plaintiff] was not treated worse because he was disabled. His complaint is that he was not given special accommodation.... [H]e is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about incompetent treatment of his paraplegia. The ADA does not create a remedy for medical malpractice.

*Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996).

**4.** In reaching this conclusion, the Court notes that if Plaintiff's allegations are true, and they are assumed to be so for the purposes of deciding the instant motion, what happened here to Decedent was tragic. As the Court hopes is clear, the decision here is only that Plaintiff cannot seek relief for the wrongs alleged under the ADA (and that the only named Defendant cannot be sued under § 1983). Obviously, this does not mean that Plaintiff could not have sought, and cannot seek, other legal remedies, including in other jurisdictions.

■ Here, Plaintiff has failed to satisfy the second element of a Title II ADA claim. The Court assumes arguendo that Decedent had an undiagnosed case of transverse myelitis before his October 4, 2002, coma, and that that condition constitutes a "disability" within the meaning of the ADA. Still, Plaintiff has not sufficiently alleged that Decedent was excluded from participation in a program or activity, or otherwise treated differently, because of this disability. To be sure, the Amended Complaint does recite this second element, almost verbatim: "Defendant acted in a discriminatory manner in that [D]ecedent was excluded in participation in or denied the benefits of Defendant's services, programs, or activities and was subjected to discrimination by the Defendant." (Am. Compl. ¶ 33.) However, when it comes to alleging facts to support this legal conclusion, Plaintiff simply asserts, "[s]pecifically, [D]ecedent was denied adequate medical services." (*Id.*) As noted extensively above, the bare allegation of inadequate medical care, even when made by a person with a serious disability, does not state a claim under the ADA.[4] Put another way, Plaintiff is claiming that Decedent was not properly treated *for* his transverse myelitis, not that he was mistreated *because* of his transverse myelitis. Accordingly, Plaintiff's ADA claim is dismissed.[5]

**5.** Because the Plaintiff has not stated an ADA claim, the Court does not address Defendant's contention that Plaintiff's ADA claim is barred by the Eleventh Amendment and the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). (Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl. 7, 9.) While courts normally consider Eleventh Amendment issues before the merits, in the ADA context, an examination of the merits is the first step of the Eleventh Amendment analysis. *See Georgia,* 546 U.S. at 159, 126 S.Ct. 877 (stating that lower courts considering whether Congress has validly abdicated sovereign immunity for a given suit should "on a claim-by-

### III. Conclusion

For the reasons stated herein, Defendant's Motion to Dismiss is granted. This dismissal is with prejudice because Plaintiff has already had an opportunity to amend the Complaint to cure precisely the defects that now serve as the basis for dismissal. (Dkt. No. 4.) *See Benedict v. Amaducci,* No. 92–CV–5239, 1995 WL 702444, at *9 n. 5 (S.D.N.Y. Nov. 28, 1995), *aff'd,* 101 F.3d 1393 (2d Cir.1996). The Clerk of the Court is respectfully directed to terminate the pending motion (Dkt. No. 8), and close this case.

SO ORDERED.

claim basis," "determine ... (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."); *Degrafinreid v. Ricks,* 417 F.Supp.2d 403, 411 (S.D.N.Y. 2006) (applying *Georgia's* three-step test), *reconsidered on other grounds,* 452 F.Supp.2d 328 (S.D.N.Y.2006).