**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4259
_____

ROBIN S. VALDEZ,

Appellant

v.

CARL DANBERG; PERRY PHELPS; CHRISTOPHER KLEIN;
CERTAIN INDIVIDUAL EMPLOYEES OF THE STATE OF
DELAWARE DEPARTMENT OF CORRECTION; DAVID PIERCE

_____

On Appeal from the District Court
for the District of Delaware
(District Court No.: 1-11-cv-00216)
District Judge: Honorable Leonard P. Stark

_____

Argued on July 9, 2014

Before: RENDELL, CHAGARES and JORDAN, Circuit Judges
(Opinion filed: August 4, 2014)

Jeffrey K. Martin, Esquire **(Argued)**
Martin & Associates, P.A.
1508 Pennsylvania Avenue
Suite 1C
Wilmington, DE 19806

Counsel for Appellant

Ryan P. Connell, Esquire **(Argued)**
Delaware Department of Justice
820 North French Street
Carvel Office Building, 6th Floor
Wilmington, DE   19801

Counsel for Appellees

O P I N I O N

**RENDELL**, <u>Circuit Judge</u>:

Appellant Robin Valdez appeals the order of the United States District Court for the District of Delaware granting defendants' motion for summary judgment on his claims under 42 U.S.C. § 1983. For the reasons set forth below, we will affirm.

## I. BACKGROUND

Valdez, who has been completely deaf since birth, was incarcerated at the James T. Vaughn Correctional Center ("Vaughn") in Smyrna, Delaware from April 12, 2009 through January 22, 2010. The reasons for Valdez's incarceration are not relevant to this appeal, and we do not address them herein.

In early October 2009, Valdez sent a letter to Perry Phelps, Warden of Vaughn, complaining that he had not been granted access to a telephone typewriter ("TTY") device, which enables hearing impaired individuals to communicate over the telephone. The letter was received in Phelps's office on October 5, 2009. Phelps referred the letter to correctional counselor Ron Hosterman, with copies to Deputy Wardens Christopher Klein and David Pierce. On October 7, 2009, Valdez followed up on his letter with a

formal grievance, reiterating his complaints about the lack of access to the TTY and urging that he must be permitted to use the phone two to three times per week as hearing inmates were able to do. As with Valdez's letter, this grievance was referred to Hosterman. In a follow-up document, Hosterman noted that, "[f]ollowing a meeting with his counselor which allowed the use of the TTY phone, Valdez signed off for informal resolution of this grievance." (J.A. 181.)

Valdez filed a second grievance on January 7, 2010. As in the first grievance, he stated that he was being denied access to the TTY device, and noted that he had been able to use the TTY only twice during his entire nine-month incarceration. Like the first, this grievance was referred to Hosterman. On January 11, Hosterman reported that, "[i]n a meeting with his counselor, Valdez was reminded of the previous directions he received about contacting his co[u]nselor to arrange use of the TTY, and he signed off for informal resolution." (J.A. 173.) Valdez was released from Vaughn eleven days later.[1]

Valdez testified that he was put into solitary confinement on two occasions during his time at Vaughn, both times for fighting with another inmate. Valdez states that he was unable to express himself to corrections officers during these incidents due to the lack of a sign language interpreter. On at least one of these occasions, guards used pepper spray on Valdez. Although in pain, Valdez states that he was unable to communicate his injuries to prison staff, and therefore received no medical attention. A

---

[1] Valdez testified that he filed other letters and grievances in addition to those contained in the record. However, in the grievance filed on January 7, 2010, mere days before he was released, Valdez states that it was his second grievance. (*See* J.A. 175.)

3

misconduct hearing was held in connection with at least one of these incidents.[2] Though the hearing was held outside his cell, Valdez was evidently required to sit in his cell without any way of knowing what was being said, and without any method of communicating his version of events to the hearing officers. The hearing resulted in Valdez's being found guilty of misconduct.

Valdez also testified that he had poor eyesight, but without a sign language interpreter, was unable to effectively explain this problem to prison medical staff. As a result of the lack of corrective treatment, he suffered from migraines. In addition, he testified that he had pain in his appendix but had difficulty communicating this pain to medical staff without the assistance of an interpreter.

It is undisputed that, during the entirety of Valdez's incarceration, Vaughn had no policies for accommodating the needs of deaf inmates. In March of 2011, the Bureau of Prisons instituted a new policy for compliance with the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq*. ("ADA"), which specifically provided for "appropriate auxiliary aids and service accommodations" for hearing impaired inmates and required that they receive "information about the location of accessible services, activities, and facilities in a format that is accessible to people who are deaf or hard of hearing." (J.A. 140.)

Valdez filed his complaint in this matter on March 11, 2011, naming Delaware Department of Correction Commissioner Carl Danberg, Warden Phelps, and Deputy Wardens Klein and Pierce as defendants in their individual capacities. Relevant for our

---

[2] It is unclear whether the pepper spray injury or the misconduct hearing occurred in connection with the first time Valdez was put into isolation, the second, or both.

4

purposes, Valdez's complaint included: (1) a § 1983 claim for cruel and unusual punishment for failing to accommodate his hearing disability; (2) a § 1983 claim for failure to train and/or maintenance of wrongful customs, practices and policies; and (3) a § 1983 claim for cruel and unusual punishment for subjecting Valdez to solitary confinement without a satisfactory hearing.[3]

On July 26, 2012, the defendants moved for summary judgment. The District Court granted the defendants' motion in full, holding that: (1) Valdez had failed to produce evidence that each of the individual defendants was personally involved in the alleged deprivation of his rights; (2) the defendants were entitled to qualified immunity because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known; and (3) the Court lacked personal jurisdiction because Valdez had failed to effect personal service on the individual defendants. Valdez filed this timely appeal.[4]

## II. DISCUSSION

We review a district court's grant of summary judgment *de novo*. *Azur v. Chase Bank USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). "Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id*. (internal quotation marks and citations omitted).

---

[3] Valdez's complaint also included claims under the ADA and Rehabilitation Act, 29 U.S.C. § 794 *et seq*., and a § 1983 claim for cruel and unusual punishment for excessive length of detention awaiting extradition. Valdez no longer pursues those claims.
[4] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

We have held that:

> To establish § 1983 liability in [the prison] context, a plaintiff must first demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that [harm] was being, or would be, inflicted. Second, the plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight. Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the [violation of the federal right].

*Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989). It is well-established that an individual government defendant in an action under § 1983 must have had some personal involvement in the alleged wrongdoing to be held liable. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

Furthermore, it is well-established that a prison official cannot be held liable under § 1983 under a *respondeat superior* theory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); *Evancho*, 423 F.3d at 353. However, supervisors may still be held liable under § 1983 for their own violations of an individual's constitutional rights. *Iqbal*, 556 U.S. at 676. We have recognized two theories of supervisory responsibility: (1) where a supervisor establishes and maintains a policy, practice or custom which directly causes a constitutional harm; and (2) where the supervisor participates in violating a plaintiff's rights, directs others to violate them, or has knowledge of and acquiesces in the violations. *Santiago*, 629 F.3d at 129 n.5. *See also Sample*, 885 F.2d at 1116-17 (supervisory liability may be imposed only where the supervisor was the "moving force" behind the constitutional tort).

6

## A. Personal Involvement of Phelps, Klein and Pierce

The only evidence in the record regarding the defendants' knowledge of Valdez's difficulty gaining access to the TTY is Valdez's October 2009 letter to Warden Phelps. Upon receiving Valdez's letter, Warden Phelps referred the complaint to Ron Hosterman, with instructions to handle the issue, and sent copies to Pierce and Klein. Klein testified that he believed the issue was being handled without his further involvement. Pierce testified that it was incumbent upon Valdez to seek access to the telephone through his correctional counselor. Valdez has presented no evidence demonstrating that it was the responsibility of Phelps, Pierce or Klein to personally ensure that he was provided access to the TTY. *Cf. Sample*, 885 F.2d at 1110-11 (affirming district court's finding of liability under § 1983 where "Diecks acknowledged . . . that he believed his investigation was the only avenue available to an inmate challenging detention and this was confirmed by the fact that Diecks did not refer Sample to anyone else in a position to resolve the problem."). Nor has Valdez presented evidence that defendants had any reason to believe that delegating the matter to Hosterman would be insufficient. As such, Valdez has failed to demonstrate that Phelps, Pierce or Klein were deliberately indifferent to the concerns raised in his October 2009 letter.

Valdez later filed two formal grievances regarding his lack of access to the TTY. The evidence indicates that both grievances were referred to Hosterman, that Hosterman followed up with Valdez within a matter of days, and that Valdez signed off on informal resolutions to both grievances. There is no evidence that Phelps, Pierce or Klein ever saw or were otherwise made aware of either of these grievances. Accordingly, Valdez

7

has failed to demonstrate that any of these three named defendants were aware that there was an ongoing problem with respect to his access to the TTY, much less that they caused, or were deliberately indifferent to, such problems.

None of the defendants were questioned in their depositions regarding Valdez's lack of a sign language interpreter during medical evaluations or treatment; accordingly, Valdez's testimony on these issues is uncontradicted. However, Valdez points to no evidence that any of the named defendants were ever notified of any problems with his access to medical care or an inability to communicate with medical staff. Nor does he indicate that he ever filed any complaints or grievances that would have put the defendants on notice of these issues. Accordingly, Valdez cannot demonstrate that the defendants were personally involved in preventing him from communicating effectively with medical personnel.

Similarly, none of the defendants were questioned during their depositions regarding Valdez's lack of an interpreter during his misconduct hearing, and none dispute Valdez's account of that incident—*i.e.*, that the misconduct hearing was held outside his cell without an interpreter, and he had no way of knowing what was going on. While such allegations, if taken as true, raise serious questions, Valdez has not pointed to any evidence suggesting that any of the named defendants were aware that he was not granted an interpreter during his misconduct hearing. Valdez does not indicate in his deposition or his answers to interrogatories who was present at that hearing, and nothing in the record suggests that any of the named defendants would normally have been present at such hearings. Nor does he indicate that he filed any complaints or grievances that would

8

have put any of these defendants on notice that he had not had the assistance of an interpreter at his misconduct hearing.  Absent such evidence, Valdez cannot demonstrate that these defendants had any personal involvement in depriving him of his rights in connection with his misconduct hearing.  *See Sample*, 885 F.2d at 1110 (requiring that a prison official have knowledge of the alleged deprivation of constitutional rights to be found liable under § 1983).

Nor may Phelps, Pierce or Klein be held liable under § 1983 for failing to implement policies to accommodate deaf inmates.  First, there does appear to have been a policy in place for Valdez to request to use the TTY.  As noted *supra*, Valdez was to notify his correctional counselor when he wished to use the device.[5]  Though this might have been difficult for him at times, that difficulty does not mean that there was no policy in place.  Moreover, Valdez has not pointed to any evidence that would demonstrate that it was the responsibility of any of these named defendants to establish or implement policies for providing interpreters during misconduct hearings or medical examinations or treatment.  In fact, the record indicates that when an ADA policy was ultimately implemented, it was done at a higher level, by the Bureau of Prisons.  Absent evidence that the named defendants were responsible for implementing policies with respect to deaf inmates but deliberately failed to do so, they cannot be held liable under § 1983.

**B.  Personal Involvement of Commissioner Danberg**

---

[5] In his deposition testimony, Valdez admitted that he was aware that he needed to contact his correctional counselor in order to request access to the TTY.  He testified that when he wished to use the TTY he would wave his hands to get the counselor's attention, but that it was "impossible."  (J.A. 60.)  He admitted that he did get to use the TTY "when [he] was lucky enough to get the counselor's attention."  (*Id.*)

Valdez does not claim that Commissioner Danberg had actual knowledge of his alleged difficulties in gaining access to the TTY device or that he did not have the assistance of an interpreter during medical appointments or misconduct hearings. Rather, Valdez appears to base Danberg's liability entirely on his position as Commissioner of the Department of Correction and his failure to implement department-wide policies regarding the treatment of deaf inmates. In his deposition, Danberg testified that before he took over the Department of Correction in February 2007, there were no written policies regarding deaf inmates specifically or compliance with the ADA generally. He testified that when he became Commissioner, he specifically asked that such a policy be developed. In fact, Danberg testified that the Bureau-level ADA policy that was eventually implemented in early 2011 was created at his direction.

"Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). *See also Brumfield v. Hollins*, 551 F.3d 322, 328 (5th Cir. 2008) ("[I]n a claim alleging failure to promulgate policy as a basis for § 1983 liability, the failure must be an intentional choice and amount to subjective deliberate indifference.") (internal quotation marks and citations omitted). *See also Tafoya v. Salazar*, 516 F.3d 912, 922 (10th Cir. 2008) ("At the summary judgment stage, the requirement of deliberate indifference

10

imposes a burden on the plaintiff to present evidence from which a jury might reasonably infer that the prison official was actually aware of a constitutionally infirm condition.").

Here, Valdez has produced no evidence suggesting that Danberg was aware that deaf inmates had been denied use of the TTY or that any deaf inmates had not been provided with interpreters during medical treatment or misconduct hearings. Valdez has pointed to no evidence that Danberg was aware of any issues with deaf inmates at all. As such, no reasonable jury could find that Danberg was deliberately indifferent to the alleged violations of Valdez's rights. Moreover, any claim of deliberate indifference on Danberg's part is undermined by his uncontradicted testimony that, when he became Commissioner of the Department of Correction, he set about establishing a policy to address issues arising under the ADA, including issues relating to deaf or hearing impaired inmates. As such, Valdez has failed to adduce evidence sufficient for a reasonable jury to find that Danberg's failure to immediately implement an ADA policy was the product of deliberate indifference to the problems of inmates with disabilities.

Because we agree that Valdez has failed to identify facts that would allow a reasonable jury to find that any of the named defendants were personally involved in the alleged deprivation of his statutory or constitutional rights, we will affirm the District Court's grant of summary judgment for the defendants.[6]

---

[6] Because we affirm the District Court's grant of summary judgment on the ground that Valdez has failed to demonstrate the personal involvement of any named defendant, we do not discuss in detail the issues of qualified immunity or service of process. With respect to qualified immunity, however, we note that the right of a state prisoner to receive reasonable accommodations under the ADA has been clearly established since the Supreme Court's decision in *Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206

11

(1998).  In addition, we disagree with the District Court's holding that it lacked personal jurisdiction because Valdez failed to effect service of process.  The defendants actively litigated this case for over a year after serving their Answer, failing to pursue the issue of service of process in any meaningful way until they filed their motion for summary judgment in July of 2012—after the statute of limitations on Valdez's § 1983 claims had expired.  By failing to press the issue earlier, they waived it.  *See Bel-Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 443-44 (3d Cir. 1999); *In re Texas Eastern Transmission Corp.*, 15 F.3d 1230, 1236 (3d Cir. 1994); *King v. Taylor*, 694 F.3d 650, 656-61 (6th Cir. 2012).